511 So.2d 314 (1987)
Grace B. FUTCH, Appellant,
v.
Howard HEAD, Appellee.
Nos. BL-287, BM-442 and BN-326.
District Court of Appeal of Florida, First District.
May 18, 1987.
Rehearing Denied August 25, 1987.
*315 W.H.F. Wiltshire, of Harrell, Wiltshire, Stone & Swearingen, Pensacola and Julian Clarkson, of Holland & Knight, Tallahassee, for appellant.
DuBose Ausley, William M. Smith, and Emily S. Waugh, of Ausley, McMullen, McGehee, Carothers & Proctor, Tallahassee and Robert G. Kerrigan, of Kerrigan, Estess & Rankin, Pensacola, for appellee.
SHIVERS, Judge.
Appellant, Grace B. Futch, appeals from a final judgment and raises the following five issues for our consideration: (1) whether the trial court correctly found contract terms giving rise to an enforceable contract between her and appellee, Howard *316 Head; (2) whether the statute of frauds barred Head's breach of contract action; (3) whether the trial court erred in applying the Florida Anti-Fencing Act for the purpose of trebling Head's damages; (4) whether Head was the procuring cause in the sale of a tract of beach property known as the "Melroe" property. Futch also faults the trial court's order denying rehearing insofar as it determined that she had failed to distinguish her personal finances from those of two corporations, Realty Center, Inc. and Pensacola Realty, Inc. We affirm on four of these issues, but reverse on the issue of whether the trial court erred in applying the treble damage provision of the Florida Anti-Fencing Act.
Head and Futch were registered real estate brokers who had worked together in joint real estate ventures for a number of years. Head worked as a sales agent at Realty Center, Inc., a real estate firm which Futch owned. Sometime during 1979, Futch approached Head and asked him to assist her in the sale of a 99-year leasehold interest in 30.58 acres of property located on Santa Rosa Island, Escambia County, Florida. Irving Melroe, a Colorado resident, owned the land, and at some point it became common with those involved in its transfer to refer to it as the "Melroe" property. Pensacola Beach Realty, Inc., another real estate agency owned and controlled solely by Futch, had listed the acreage, and Head and Futch agreed to share the commission derived from its sale. Head contacted Stanley Levin, the brother of Fred Levin, a trial attorney and businessman in Pensacola whom Head and Futch hoped to interest in the Melroe property. Head arranged a meeting which Stanley Levin, Head, and Futch attended. After having been informed about the property, Stanley immediately took Head to Fred Levin's office and introduced him. Head then told Fred Levin about the Melroe property. Fred Levin, along with several other parties, ultimately purchased the Melroe property for $400,000 plus an additional $50,000 to be paid upon rezoning.
Part of the terms of the final sale included Futch acquiring a 20% interest in the Melroe property because of her efforts in consummating its sale. Futch ultimately sold her share of the land for $1,300,000. Prior to the closing date, Futch informed certain people that she and Head were involved in a deal concerning the Melroe property and that Head would be compensated should the property be sold. The instant lawsuit arose when Futch failed to fulfill that promise.
On September 17, 1982, Head filed a complaint alleging breach of contract and fraud as a result of Futch's failure to pay a real estate commission. Head filed a total of seven complaints, the seventh and final of which asserted claims for breach of contract, tortious interference with contractual rights, conversion, fraud, and theft. The complaint also asked that a constructive trust be impressed upon the proceeds and profits from Futch's sale of her share of the Melroe property. A three day non-jury trial ensued culminating in Head receiving a $390,000 award for breach of contract and conversion in addition to costs and attorney's fees. The trial court judge reflected the following findings of fact in his final judgment:
1. There was an oral contract between the parties for the plaintiff to perform certain introductions in connection with the sale of the beach property known as the "Melroe" property.
2. Defendant was to convey one-tenth of her twenty percent interest in the property, whatever that might be, to the plaintiff in return for the introductions if a sale resulted therefrom.
3. A sale was consummated to the benefit of the defendant as contemplated.
4. The defendant failed to convey to the plaintiff what was owed under the contract, thus breaching same.
5. Defendant later took her interest (approximately 5.645 acres) in the property in her own name converting the use and benefits of the property to her own purposes to the exclusion of the plaintiff.
6. Defendant subsequently sold this property for $1,300,000 and refused to pay to the plaintiff his contracted share.

*317 7. Defendant then converted the money to her own use and benefit with the intent to deprive the plaintiff of his right to his proportional share, this being a willful and intentional violation of Chapter 812 of the Florida Statutes.
8. Plaintiff was damaged by the breach of contract and subsequent conversion in the amount of $130,000.
9. In accordance with Chapter 812, plaintiff then shall recover damages threefold, attorney's fees, and costs.
The trial court judge entered a later order, also in favor of Head, setting attorney's fees at $100,000.
Futch first contends that the trial court incorrectly found specific contractual terms existed between her and Head which created an enforceable contract. Futch points out that the trial court concluded that an oral contract had existed between her and Head under which Head was to perform introductions to potential buyers of the Melroe property. Futch further directs our attention to the trial court's finding that as a part of this contract, she was to convey 1/10 of her 20% interest in that property in return for these introductions.
Futch maintains that neither of these conclusions find support in the record. We disagree. There is sufficient evidence in the record for the trial court to have found that a contract existed between Head and Futch such that Head was entitled to 10% of Futch's 20% share of the Melroe property. The record contains a land trust agreement concerning the Melroe property which Futch had entered into with a number of other investors. Under this agreement, Futch was granted a 20% interest in the Melroe property. Although the trial court's final judgment does not specify how Head's 10% share was calculated, it could have been determined as follows: (1) according to plaintiff's exhibit nine (a commission agreement between Futch and Head) Futch owed Head 3% of her ownership interest in the Melroe property; (2) because Head ultimately assigned 1% of his 3% interest in the Melroe property to Stanley Levin, he was left with only a 2% interest after the assignment; (3) Head's 2% interest in Futch's 20% interest equals 10%, hence the conclusion that Head had a 10% interest in the Melroe property; (4) Futch sold her 20% interest in the property for $1,300,000 for which she paid Head nothing; (5) Head's 10% slice of Futch's interest in the property, figured on a basis of $1,300,000, equals $130,000 which was trebled to $390,000 under the Florida Anti-Fencing Act. Consequently, there existed competent substantial evidence for the trial court to have found specific contractual terms entitling Head to a 10% share of Futch's 20% interest in the Melroe property. See Helman v. Seaboard Coastline Railroad Co., 349 So.2d 1187 (Fla. 1977) (appellate court must sustain verdict if there is any evidence to support it).
The essence of Head's claim to a 10% share of Futch's 20% interest in the Melroe property lies in the commission agreement he had entered into with Futch. There was conflicting testimony at trial as to whether this document was prospective or retrospective in nature. In other words, did the document reflect some future act Head had yet to perform which would entitle him to a 3% share of Futch's ownership interest in Melroe property acquirable through its development or sale? Conversely, did it refer to some past performance Head had already completed when the document was executed in June of 1980?
Futch testified the document was drafted in anticipation of some future performance by Head; Head testified his performance was already complete when the document was created. It is not the function of an appellate court to reweigh evidence or credibility of witnesses. Froman v. Froman, 458 So.2d 833 (Fla. 3d DCA 1984). The trial judge implicitly rejected Futch's testimony that the commission agreement between her and Head applied to some future task which Head was to perform, and this determination appears to have been amply supported by the record.
First, at the time Head's assignment agreement was completed (January 9, 1981) Head had left, evidently on unfavorable terms, the employ of Futch. The agreement specifically states that Head was entitled *318 to part of Futch's ownership interest in the Melroe property and that he was assigning 1% of that interest to Stanley Levin. Stanley, Futch, and Head had evidently agreed that Stanley was due something in consideration for his efforts in effecting the sale of the Melroe property. Futch testified that she asked Head to draft this document even though Head did not then have any ownership interest in the property. Futch explained that although Head possessed no interest which he could have assigned at the time the document was completed, he could still "earn his way" into an ownership interest. But the question remains: how could Head earn his way into such an interest when he no longer worked for Futch and the two had parted company on bad terms? Moreover, it is passing strange that Futch would require Head to transfer an interest to Stanley Levin if she did not think he possessed such an interest.
Second, the plain language of the June 1980 commission agreement is telling. It explicitly states that 3% of the Santa Rosa Trust is due Howard Head. The word "due" indicates any past obligations Head may have owed Futch had been completed. Consequently, there was adequate evidence to support the trial judge's finding of a specific agreement between Head and Futch, and we perceive no error in his resolution of any conflicting evidence in favor of Head.
Futch next raises the issue of whether the trial court erred in finding that Head's breach of contract action was not barred by the statute of frauds. We agree with the trial court's determination that it was not, and affirm. The agreement between Head and Futch was outside the statute because its subject was not the transfer of land from one of the contracting parties to the other. See Russell v. Thielen, 82 So.2d 143 (Fla. 1955); Blynn v. Hirsch, 124 So.2d 314 (Fla. 3d DCA 1960). Futch would distinguish the Russell decision by contending that Russell, unlike the instant case, concerned joint venturers. Futch submits that Head never proved at trial that the two were joint venturers. Therefore, Futch concludes, the Russell holding does not govern the disposition of the statute of frauds issue.
We disagree with this analysis.[1] The application of the rule expressed in Russell and Blynn does not appear to turn on whether the contracting parties were joint venturers. What takes the type of oral agreement involved in the instant case outside of the statute is the fact that it contained no provision for transferring specific property from one of the parties to the other. Futch was not promising to sell Head part of the Melroe property. She promised to pay him for his efforts in helping her sell the property. In Russell, the Florida Supreme Court cited with approval the following passage from 2 Corbin on Contracts, section 418:
A contract between two persons to go into the business of buying and selling real estate as partners or joint venturers, sharing profits and losses thereof, is not within section 4 unless there is a provision for transfer of specific land from one party to another.

82 So.2d at 146 [emphasis added]. The foregoing passage expressly applies to both joint venturers and partners who attempt to affect the transfer of property for the purpose of "sharing profits and losses thereof." Head and Futch were partners in their quest to sell the Melroe property even if the precise nature of their partnership is somewhat obscured by a welter of conflicting testimony. Head had worked in Futch's real estate office for several years, and the two had closed a number of successful land deals together. Head testified that Futch approached him and asked that *319 he drop whatever he was doing and help her sell the Melroe property. This testimony was never refuted. Head introduced Futch to Stanley Levin who immediately took them to Fred Levin's office so that they might inform him about the Melroe property. Head testified that he, Stanley Levin, Futch, and Fred Levin, had a later meeting in order to further discuss the possibility of Fred Levin purchasing the property. Futch also represented to others that she was working together with Head on the sale of the property, and that she planned to "take care of Howard." Sam Viviano, an attorney specializing in property law whom Fred Levin hired to arrange the closing of the Melroe property, testified that Head called him several weeks before the closing date claiming he had an interest in the pending sale. Finally, the commission agreement between Head and Futch, dated June 16, 1980, indicates that Futch owed Head money for his work pursuant to the sale of the Melroe property. Taken as a whole, these facts point to the existence of a partnership, rough-hewn though it may have been. They also adequately meet Futch's contention that because she and Head were not "joint-venturers" the Russell decision is inapplicable to the facts of this case.
As we have already indicated, the trial court found that a contract existed between Head and Futch and that Head was entitled to damages for Futch's breach of that contract. The implicit conclusion underlying this finding is that Head had performed his duties under the contract and had only to receive payment from Futch. Partial or complete performance removes an agreement from the statute of frauds irrespective of whether such an agreement contains as the subject the conveyance of land. See W.B.D., Inc. v. Howard Johnson Co., 382 So.2d 1323 (Fla. 1st DCA 1980).
As to Futch's contention that Head was relying on an oral commission agreement of many years standing, there is no evidence in the record to suggest that the agreement between Head and Futch mentioned, by its terms, that performance would not occur within one year. In this connection, the Florida Supreme Court has stated the following:
When ... no definite time ... [is] fixed by the parties for the performance of their agreement, and there is nothing in its terms to show that it could not be performed within a year according to its intent and the understanding of the parties, it should not be construed as being within the statute of frauds.
Yates v. Ball, 132 Fla. 132, 181 So. 341, 344 (1937). Under the foregoing rationale, Futch and Head's agreement was outside the statute even if it had existed for several years. In any event, we do not believe the facts sub judice support an inference that Head and Futch's pact respecting the Melroe property was a longstanding one. Indeed, the contrary appears to have been true. The disputed contract between Head and Futch arose around December of 1979. That the parties intended quick performance is indicated by Head's testimony that Futch was desperate to sell the Melroe property. The closing for the Melroe property occurred in May of 1980, scarcely five months after Head and Futch had entered into their agreement. For these reasons, and because their agreement did not by its terms indicate that performance could not be completed within one year, we conclude that the contract between Head and Futch was not within the statute of frauds.
We come now to the issue of whether the trial judge erred in applying a provision of the Florida Anti-Fencing Act which permits an award of treble damages to persons who have been the victim of theft or related crimes. Futch maintains, and we agree, that under Rosen v. Marlin, 486 So.2d 623 (Fla. 3d DCA) review denied, 494 So.2d 1151 (Fla. 1986), recovery of damages for breach of contract will not support a trebling of such damages under the provisions of section 812.035(7), Florida Statutes (1985). Rosen v. Marlin concerned a dispute over the proceeds of a shopping mall's sale. Rosen, the defendant, received the sale proceeds and transferred 1/2 of the balance to the plaintiff Marlin. Evidently feeling that he was entitled to more than Rosen had paid him, Marlin traveled to *320 New York City several times to discuss the matter with Rosen. Accountants spent nearly 40 hours reviewing Rosen's books attempting to determine who owed what to whom. Marlin eventually sued Rosen for breach of contract, civil theft, and conversion. The trial judge awarded Marlin $138,704.82, and then trebled that amount pursuant to section 812.035(7), Florida Statutes (Supp. 1984).
On appeal, the Third District Court of Appeal held that "recovery of damages for breach of contract will not support a trebling of such damages pursuant to the provisions of Sec. 812.035(7), Florida Statutes (Supp. 1984), [and] that such trebling is only warranted where there is no contractual relationship between the parties." 486 So.2d at 624. In explaining its holding, the court stated:
A dispute between two persons over the amount of money that one person is owed does not become a crime of theft which is actionable under section 812.035(7), Florida Statutes (Supp. 1984). A claim for breach of contract to pay money which is not specifically identifiable cannot be the subject of conversion or theft allowing for the assessment of treble damages. (citations omitted) Neither the statute nor case law construing the statute provide for the assessment of treble damages for compensatory damages arising from a breach of contract to pay money.
Id. The court also observed that although "fraud was pled, no finding of fraud was made," 486 So.2d at 623; and that in Florida, "a necessary element for establishing the crime of theft is that the defendant had, prior to the commission of the act, an intention to commit a theft." Id. (citing Hurd v. State, 440 So.2d 691 (Fla. 1st DCA 1983); State v. Dunmann, 427 So.2d 166 (Fla. 1983); Section 812.014, Florida Statutes (1983)).
Head stresses that in the instant case, unlike in Rosen, the trial court made a specific finding of conversion. The inference Head wishes us to draw from this is that the Rosen court might have trebled damages under the Anti-Theft Act had it been confronted, as we are, with a specific finding of conversion. Head's reading of Rosen is implausible in view of that decision's unequivocal holding: "recovery of damages for breach of contract will not support a trebling of such damages pursuant to the provisions of Sec. 812.035(7), Florida Statutes (Supp. 1984) ... such trebling is only warranted when there is no contractual relationship between the parties." 486 So.2d at 624 (emphasis added). The teaching of the Rosen decision, therefore, is that the existence of a contract negates any trebling of damages under section 812.035(7), irrespective of whether or not the trial court has made a specific finding of conversion.
The Rosen decision also recognizes other factors that militate against our affirmance of the trial court's treble damage award. In discussing the instances where money may be the proper subject of conversion, the Third DCA stated:
This is not a case where a party intentionally received a specifically identifiable sum of money knowing that he had no right to take it and who refused to give it back. (citations omitted) This is not a case where a party refused to pay over to the demanding party a specific fund capable of separate identification required to be deposited in a separate account as was the case in Aero International Corp. v. Florida National Bank of Miami, 437 So.2d 156 (Fla. 3d DCA 1983), pet. for rev. den., 449 So.2d 269 (Fla. 1984).
Id. at 624. Neither does the instant case involve Futch's refusal to pay over to Head a "specific fund capable of separate identification." Futch had an agreement to pay Head a commission in the event he procured the sale of the Melroe property. Florida courts have recognized that "[t]o be a proper subject of conversion each coin or bill need not be earmarked, but there must be an obligation to keep intact or deliver the specific money in question, so that such money can be identified." Belford Trucking v. Zagar, 243 So.2d 646 (Fla. 4th DCA 1970) (citing Shahood v. Cavin, 154 Cal. App.2d 745, 316 P.2d 700 (1957)). Money is said to be capable of identification *321 where it is delivered "at one time, by one act and in one mass, or where the deposit is special and the identical money is to be kept for the party making the deposit... ." Belford, 243 So.2d at 648 (emphasis added).
No such obligation existed between Futch and Head. Neither contemplated that a specific sum of money, once delivered to Futch, should be kept immutable and inviolate. Cf. Armored Car Service, Inc. v. First National Bank of Miami, 114 So.2d 431 (Fla. 3d DCA 1959) (recognizing that specified sum of money in a deposit bag which was never credited to the depositor's account was a proper subject of conversion). Futch merely owed a debt to Head which could be discharged by the payment of money in general and as such was not the proper basis for conversion. See Rosen v. Marlin, 486 So.2d 623 (Fla. 3d DCA 1986); accord Capital Bank v. G & J Investments Corp., 468 So.2d 534 (Fla. 3d DCA 1985); Douglas v. Braman Porsche Audi, Inc., 451 So.2d 1038 (Fla. 3d DCA 1984).
We also note that although the trial court judge found that "[p]laintiff was damaged by the breech [sic] of contract and subsequent conversion in the amount of $130,000," he nowhere specifies how Futch's conversion resulted in some separate damage to Head apart from whatever contractual damages he had already incurred. In this respect, the Rosen court stated the following:
The trial court found no separate compensatory damages stemming from a conversion or theft apart from the $138,704.82 found to be due and owing as payment pursuant to the contract and the claim for breach of contract contained in Count I. Accordingly, the finding of an independent tort cannot stand as a matter of law. Overseas Equipment Company, Inc. v. Aceros Arquitectonicos, 374 So.2d 537 (Fla. 3d DCA 1979).
Neither the record nor counsel for appellee inform us of any facts, other than those presented under Head's breach of contract claim, to establish any additional or unique loss under Head's conversion claim, and therefore there is no basis for Head's conversion action as an independent tort. See Overseas Equipment Co., Inc. 374 So.2d at 539.
In rejecting Head's contention that Florida's Anti-Fencing Statute permits both contractual damages and treble damages for conversion based on essentially the same conduct, we are aware that the legislature often enacts legislation for the purpose of amending the common law. In this connection, the courts must look to the plain meaning of a statute in order to discern whether the legislature sought to repair some defect in existing precedent. Yet we find nothing in the language of the Anti-Fencing Act to support the construction of the statute which Head would have this court apply. And despite the holding of the Third DCA in Rosen v. Marlin, which explicitly interpreted the treble damage provision of section 812.035(7) as precluding a concurrent award for breach of contract and conversion, Head directs us to no decision which has extended section 812.035(7) in the manner which he advocates. We therefore conclude that neither the Anti-Theft Act nor existing case law interpreting that act support the trial court's award of treble damages under section 812.035(7), Florida Statutes (Supp. 1984). Because the Anti-Theft statute is inapplicable, the award of attorney's fees must also fail. Rosen, 486 So.2d at 627.
We next consider whether the trial court correctly found that Head was the procuring cause in the sale of the Melroe property and hence entitled to a commission. Futch advances two arguments to support her contention that Head was not the procuring cause of the Melroe property's sale. First, Futch alleges that there was a break between her initial meeting with Head and Fred Levin and the later mention of the property to Levin from another real estate broker named Jim Scoggins. Futch also indicates that the terms for the sale of the property discussed in the initial meeting were substantially higher than those later mentioned by Scoggins. Relying primarily on a definition set out in Black's Law Dictionary,[2] *322 1088 (5th Ed. 1979), Futch concludes that these factors suggested a break in the continuity of events leading to the sale of property such that Head could not have produced the property's sale.
We disagree with this analysis. Where, as here, two brokers work together to effect the sale of property, each operates under the joint agency of his co-broker. In Tassy v. Hall, 429 So.2d 30, 35 (Fla. 5th DCA 1983), the Fifth District Court of Appeal recognized this concept:
[A] cooperating arrangement or agreement between two brokers is in the nature of a joint venture between the two professionals and, as to third parties, the acts of each broker in the pursuance of the cooperating agreement is the act of the other. If, while acting under such a cooperating agreement, one of the brokers procures a purchaser, then, insofar as third parties are concerned, both have been the procuring cause of the sale.
The same legal principle  that of brokers acting as a single unit  is applicable here. Head and Futch were operating collectively as one unit whose focal point was the sale of the Melroe property. This disposes of Futch's contention that Head did not procure the Melroe property's sale because he did not remain personally involved in continual negotiations with the ultimate purchasers. Under the principle announced in Tassy, any further efforts on the part of Futch in her later meetings with the ultimate purchasers of the Melroe Property were also legally attributable to Head. Further, as Head indicates in his brief, there is no question but that he arranged for Futch's initial introduction to Fred Levin, who soon became the main force in organizing the sale of the Melroe property as well as one of its principal owners.
We also find unpersuasive Futch's theory that the break in time regarding the negotiations as well as the later reduction of the Melroe property's offering price suggest that Head was not the procuring cause of sale. It took only five months from the time Fred Levin was informed about the existence of the Melroe property for the deal to close. This is not a long period of time in which to complete a $400,000 land transaction. Moreover, the record provides the most plausible explanation for the break between Fred Levin's initial introduction to the property and the closing on May 9, 1980: Fred Levin was embroiled in a huge lawsuit when he was first told about the property. This made it impossible for him to give his full attention to the Melroe deal until the lawsuit had been completed. For these reasons, we affirm the trial court's finding that Head was the procuring cause of the Melroe property's sale.
Futch's next alleges that the trial court erred in piercing the corporate veil of Realty Center, Inc. and Pensacola Realty, Inc. Futch states that Head was employed by both of these corporations, and that an order to pierce the corporate veil, a corporation must be formed for the purpose of misleading creditors. We find Futch's argument too restrictive because it intimates that "piercing" questions are determined solely through a consideration of the events surrounding formation of the corporation. However, the Florida Supreme Court has recognized that the corporate veil may be pierced upon a showing of improper conduct or that the corporation was "formed or used for some illegal, fraudulent or unjust purpose... ." Dania Jai-Alai, Inc. v. Sykes, 450 So.2d 1114, 1121 (Fla. 1984) (emphasis added) (quoting Robert's Fish Farm v. Spencer, 153 So.2d 718 (Fla. 1963)). Futch's conduct towards Head was improper given the duty of honesty and fair dealings which brokers are to abide by in dealing with one another. See Alter v. Adams, 185 So.2d 490 (Fla. 3d DCA 1966) (acknowledging that brokers cooperating *323 in sale of tract of land are charged with duty of honesty and fair dealing).
Futch never attempts to refute Head's allegations that the two corporations of which she was the sole stockholder, Realty Center, Inc., and Pensacola Beach Realty, Inc., were shams. Nor does she deny that she commingled her personal and corporate funds with respect to both of these corporations. Indeed, the record discloses the following regarding Futch's relationship with her two corporations: (1) Futch merged her corporation's liabilities and assets with her own personal funds; (2) she failed to distinguish between her individual and corporate capacities in connection with the Melroe property; (3) she paid one of her companies a $130,000 commission when she sold her five-acre share of the Melroe property. These factors evince an extremely loose observation of corporate formalities suggesting Futch did not consider herself as distinct from her corporations, and we therefore affirm the trial court's findings.
We disagree with Futch's final assertion that section 475.42(1)(d), Florida Statutes, indicates that Head cannot assert a claim against anyone except his employer. Futch denies that she employed Head and contends that either Realty Center or Pensacola Realty employed him. We find Futch's contention unpersuasive primarily because it presupposes a separation between Futch and her corporations which, as we have already indicated, did not exist. Section 475.42(1)(d) provides:
No salesman shall collect any money in connection with any real estate brokerage transaction, whether as a commission, deposit, payment, rental, or otherwise, except in the name of the employer and with the express consent of the employer; and no real estate salesman, whether the holder of a valid and current license or not, shall commence or maintain any action for a commission or compensation in connection with a real estate brokerage transaction against any person except a person registered as his employer at the time the salesman performed the act or rendered the service for which the commission or compensation is due.
The statute only purports to forbid lawsuits between salesmen. Its language nowhere indicates an intent to ban suits between brokers. Futch admits in her answer to Head's complaint that Head was a registered real estate broker "in accordance with the provisions of section 475.42(1)(d)... ." A court is governed by a statute's plain language and as such is powerless to go outside the statute in search for excuses to give a different meaning to words used in the statute. Florida Real Estate Commission v. McGregor, 268 So.2d 529, 530 (Fla. 1972). We therefore affirm the trial court's conclusion that section 475.42(1)(d), Florida Statutes did not bar Head's claim for recovery.
AFFIRMED in part, REVERSED in part.
MILLS and JOANOS, JJ., concur.
NOTES
[1] One of the reasons we part company with Futch on this issue is that we believe Head and Futch were joint venturers, a point which we develop more fully under our discussion concerning whether Head was the procuring cause of the Melroe Property's sale. While the law does recognize that the principal difference between partnership and joint venture is that a joint venture is usually limited to a single enterprise, see, e.g., Russell v. Thielen, supra, we find for reasons expressed above that this distinction is substantively meaningless for purposes of determining whether a particular agreement is within the statute of frauds.
[2] A broker will be regarded as the "procuring cause" of a sale, so as to be entitled to commission, if his efforts are the foundation on which the negotiations resulting in a sale are begun. A cause originating a series of events which without break in their continuity result in accomplishment of prime objective of the employment of the broker who is producing a purchaser ready, willing and able to buy real estate on the owner's terms. Mohamed v. Robbins, 23 Ariz. App. 195, 531 P.2d 928, 930 (1975).