Charles W. DWIGHT, III, Plaintiff–Appellee, Cross–Appellant,

v.

Joan F. TOBIN, Howard N. Ellman, Defendants–Appellants, Cross–Appellees.

No. 90–5037.

United States Court of Appeals, Eleventh Circuit.

Nov. 20, 1991.

Rehearing Denied Dec. 27, 1991.

Michael Nachwalter, Scott E. Perwin, Brian F. Spector, Miami, Fla., Kenneth S. Geller, Kerry Edwards Cormier, Washington, D.C., Daniel S. Pearson, Holland & Knight, Miami, Fla., for Tobin.

John M. Brumbaugh, Robert J. Borrello, Floyd Pearson Richman Greer Weil Brumbaugh & Russomanno, P.A., Miami, Fla., David M. Berrett, Horowitz & Berrett, P.C., Denver, Colo., for Ellman.

Sara Soto, John L. Chalif, Guy B. Bailey, Jr., Mercedes C. Busto, Miami, Fla., for plaintiff-appellee, cross-appellant.

Before BIRCH, Circuit Judge, TUTTLE *, Senior Circuit Judge, and FULLAM **, Senior District Judge.

TUTTLE, Senior Circuit Judge:

This is an appeal by defendants Joan F. Tobin ("Tobin") and Howard N. Ellman ("Ellman") and a cross-appeal by plaintiff Charles W. Dwight, III ("Dwight") from various orders of the United States District Court for the Southern District of Florida stemming from a multimillion dollar civil suit involving a number of real estate partnerships in Colorado and Florida.

---

* *See* Rule 34–2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

** Honorable John P. Fullam, Senior U.S. District Judge for the Eastern District of Pennsylvania, sitting by designation.

## I. Statement of the Case

In 1987, Dwight filed a civil complaint in Florida state court alleging several claims against Tobin and Ellman, and the case was later removed to the District Court for the Southern District of Florida on diversity grounds. As ultimately amended, Dwight's complaint stated claims against Tobin for breach of an oral partnership agreement between Dwight and Tobin, breach of fiduciary duty, tortious interference with contractual and business relationships, and declaratory relief. Dwight's complaint against Ellman alleged that he had tortiously interfered with Dwight's business relationship with Tobin.

Tobin raised numerous counterclaims against Dwight including fraud in inducing her to invest in two Colorado real estate partnerships, civil theft, conversion, breach of fiduciary duty, breach of contract, RICO violations, and securities fraud.

Ellman asserted fourteen counterclaims against Dwight, including a claim that Dwight had breached his fiduciary duties to Ellman and a claim that Ellman had repaid $200,000 to the Bank of San Francisco on Dwight's behalf.

The jury returned a verdict for Dwight on his breach of contract claim against Tobin, awarding him $350,000 for the value of his services to the partnership and $3,000,000 for damages to his business reputation resulting from the breach. The jury also returned a verdict for Dwight on his tortious interference with business relationship claim against Ellman, awarding him $2,000,000 for injury to his business reputation.

The counterclaims raised by Tobin and Ellman were tried with Dwight's claims. The jury returned verdicts against Tobin on all of her counterclaims, except the claims for conversion of a certain automobile, contribution on the repayment of a note to the Laredo National Bank, and breach of contract in connection with the sale of stock. The jury awarded her approximately $83,000 in damages. The jury also returned verdicts against Ellman on all of his coun-terclaims, except the claim for repayment on the note to the Bank of San Francisco. The jury awarded Ellman $200,000 on this counterclaim.

Tobin and Ellman made timely motions for judgments notwithstanding the verdict and for new trials. The district court denied these motions, and both Tobin and Ellman appeal.[1]

## II. Statement of the Facts

During the early 1980's, Charles Dwight, a Colorado real estate developer, joined Howard Ellman, an attorney, and John M. Beattie, in incorporating the Siena Company. The Siena Company served as the general partner in three real estate partnerships—the Ironwood Partnership, Siena Number One, and Siena Eastpark, Ltd. (collectively known as the "Siena Ventures")—involved in the construction and development of office, retail and manufacturing space in the Boulder, Colorado area. Dwight, Ellman, and Beattie were also individual partners in these partnerships. In all of the partnerships, Dwight was the "lead developer" and oversaw the details of the construction and management of the projects.

Both parties agree that by 1986 the Siena Ventures were in serious financial trouble. The development of the projects had required heavy financial leveraging, and the occupancy rate in the buildings was low. At least one lender had formally declared a default on its construction loans, and the partnerships were late on other payments. There was uncontradicted testimony at trial that the partnerships had engaged in irregular financial practices during this time, including commingling of funds, unauthorized overdrawing, and check kiting.

Joan Tobin was the beneficiary of a trust that included three valuable parcels of property in Naples, Florida, known as "Third Street" (retail, office, and restaurant space), "Crayton Cove" (a boathouse and land on Naples Bay), and the "Caribbean Gardens" (200 acres of undeveloped

1. Dwight also appealed a number of different holdings of the district court. After careful review, we find that the issues he raises are without merit.

land just outside of Naples). The properties were owned by an entity known as Neapolitan Enterprises, which, in turn, was owned by the trustees of the trust. Tobin, her brother, her sister, and her mother were beneficiaries of the trust properties.

Dwight and Tobin first met at a dinner party in Aspen, Colorado in February of 1986. There, Dwight described his real estate projects in Colorado, and Tobin described her real estate interests in Florida. She invited Dwight to visit Florida, and Dwight later toured the properties offering general suggestions on how to improve their value.[2]

After Dwight viewed the properties, Tobin apparently told Dwight that she wanted to form a partnership with him to develop the Florida properties. Over a period of several weeks, they reached an oral agreement on the partnership. It provided that Dwight would develop the Florida properties and would give Tobin a share in two of the Colorado partnerships that was equal to Dwight's share; Tobin would invest approximately $2,000,000 in those two Colorado partnerships, would meet all of the financial obligations of the Siena Ventures, and would give Dwight a fifty percent equity interest in the Florida properties.

Dwight presented ample evidence that Tobin frequently described herself to others as Dwight's "partner" in a real estate venture involving properties in Colorado and in Florida. The two borrowed considerable sums of money together from a number of different banks, purchased and managed several parcels of real estate together, and bought planes, cars and a boat. They even went so far as to draft a partnership agreement; this draft, however, lacked provisions on material terms and was never signed by either party.

While the evidence was disputed, Dwight presented testimony that he invested considerable time and effort in the development of the Florida properties. He diverted time and energy from his ventures in Colorado, and it was only Tobin's continu-

ing investments in these projects (which ultimately amounted to over $2,000,000) that permitted these partnerships to meet their financial obligations. There was testimony that under a separate agreement with Neapolitan Enterprises Dwight received over $313,000 in fees and approximately $131,000 in expenses for his work on the Florida properties from the spring of 1986 to the fall of 1987.

By the spring of 1987, the business relationship between Tobin and Dwight had begun to unravel. According to Dwight, Tobin and Ellman had commenced a romantic relationship at about this time, and Ellman began to usurp Dwight's role in the alleged Dwight–Tobin partnership. Ellman gradually took control of important decisions in the Dwight–Tobin ventures, and on March 20, 1987, Tobin finally called Dwight on the telephone and terminated their business relationship. Thereafter, Ellman assumed the role as developer on the Florida properties; Neapolitan Enterprises terminated Dwight's management contract, and Tobin stopped funding the obligations of the Colorado partnerships. The Colorado properties then soon fell into bankruptcy.

There was testimony at trial that as a result of the defaults and bankruptcies Dwight suffered injury to his business and credit reputation.

### III. Discussion

#### A. *Tobin's Appeal*

Tobin argues that the district court erred in refusing her motion for a judgment NOV. Tobin argued below that the statute of frauds applied to her alleged partnership agreement with Dwight and that it was unenforceable. The district court agreed that the statute of frauds applied but held that the doctrine of part performance removed the statute of frauds barrier. Tobin challenges this finding.

 As an initial matter, the district court was certainly correct in finding that the statute of frauds applies to this con-

---

**2.** The parties vigorously dispute the course of events from this point forward, and both sides presented evidence in support of their version of the facts. Since the jury found for Dwight, however, we accept his version to the extent we find sufficient support for it in the record.

tract. Under well-settled Florida law, the statute of frauds bars the enforcement of a contract when the parties intended and contemplated that performance of the agreement would take longer than one year. *Yates v. Ball,* 132 Fla. 132, 181 So. 341, 344 (1937). The intent of the parties may be inferred from the "surrounding circumstances" or the "object to be accomplished." *Id.* As the purpose of the alleged Dwight–Tobin partnership was the purchase and development of properties throughout the country it seems clear that neither party intended the contract to be performed within a year from the time that it was made. While it is certainly possible that some agreements regarding the purchase and development of real estate could be accomplished within a year and would thus fall outside the statute of frauds, the contract under consideration in this case involved a long-term development scheme that would take a great deal of time to accomplish. Consequently, we agree with the district court that the statute of frauds applies to this contract.

 We disagree, however, with the district court's ruling that the doctrine of part performance removes this contract from the operation of the statute of frauds. In *Elsberry v. Sexton,* 61 Fla. 162, 54 So. 592 (1911) the Supreme Court of Florida unequivocally held that part performance is an equitable doctrine only and is not available in actions for damages at law.

> Where a contract is for the sale of lands, or any interest therein, and is not in writing, no action at law can ever be maintained upon it. *Part performance of such a contract is a ground of relief in equity only,* and there on the principle of relieving from fraud.

*Elsberry,* 61 Fla. at 166, 54 So. at 593. Thus, while the courts may use the doctrine of part performance to remove a contract from the statute of frauds for the purpose of granting specific performance or other equitable relief, the doctrine is not available in an action solely for damages at law. In this case, Dwight sought only monetary compensation for his damages, and the part performance doctrine is inapplicable.

While Dwight cites a handful of cases in which Florida District Courts of Appeal have failed to apply this rule, *see Futch v. Head,* 511 So.2d 314, 319 (Fla.Dist.Ct.App. 1987); *Elliott v. Timmons,* 519 So.2d 671 (Fla.Dist.Ct.App.1988), *rev. denied,* 525 So.2d 878 (Fla.1988); *Evans v. Parker,* 440 So.2d 640 (Fla.Dist.Ct.App.1983); *Bertram Yacht Sales, Inc. v. West,* 209 So.2d 677 (Fla.Dist.Ct.App.1968), we do not believe that these cases signal a change in the otherwise settled law of the state. In both *Futch* and *Elliott* the courts upheld damage awards for breach of contract despite the application of the statute of frauds, stating simply that "[i]t is well established that partial or complete performance removes an oral contract from the statute of frauds." *Elliott v. Timmons,* 519 So.2d at 672 (citing *Futch v. Head,* 511 So.2d 314, 319 (Fla.Dist.Ct.App.1987)). In neither case did the court specifically consider or reject the rule limiting the part performance doctrine to cases in equity. It does not appear that the parties raised the part performance issue in either case, nor did the courts even seem aware of the doctrine.

Likewise, the court in *Evans v. Parker,* 440 So.2d 640 (Fla.Dist.Ct.App.1983) seemed unaware of the equity limitation. On appeal of an order dismissing a counterclaim, the court examined the counterclaim to determine whether the asserted defenses of the statute of limitations and the statute of frauds appeared "clearly and unequivocally" on the face of the counterclaim. After concluding that the statute of limitations defense was inapplicable, the court stated that "[t]he conclusive applicability of the statute of frauds likewise does not clearly and unequivocally appear on the face of the counterclaim. It is *axiomatic* that partial performance of an oral contract removes such contract from the statute of frauds." *Evans,* 440 So.2d at 641 (emphasis added). While one Florida district court of appeals may have neglected to apply the equity rule at the time the court decided *Evans, see Bertram Yacht Sales, Inc. v. West,* 209 So.2d 677 (Fla.Dist.Ct.App.1968), one could hardly say that it was "axiomat-

ic" that partial performance would remove the statute of frauds bar in an action at law. It simply appears that this point was neither raised nor argued before the court.

Finally, *Bertram Yacht Sales, Inc. v. West*, 209 So.2d 677 (Fla.Dist.Ct.App.1968) was an action for damages brought under the Florida version of the Uniform Commercial Code. The Florida UCC statute of frauds makes special provisions for the applicability of partial payment, and the court relied specifically on these provisions in rendering its decision. *Bertram*, 209 So.2d at 679 ("The making of a down payment by the purchaser took the contract for sale of the boat out of the statute of frauds *by express provision in the statute* ") (emphasis added). Thus, *Bertram* in no way stands for the more general proposition that partial performance is available in all actions for damages.

Further, recent decisions by the Florida district court of appeals indicate that the venerable rule established in *Elsberry v. Sexton* over eighty years ago remains alive and well. *See Winters v. Alanco, Inc.*, 435 So.2d 326 (Fla.Dist.Ct.App.1983); *Tanenbaum v. Biscayne Osteopathic Hospital, Inc.*, 173 So.2d 492, 495 (Fla.Dist.Ct.App. 1965); *Williams v. Faile* 118 So.2d 599 (Fla.Dist.Ct.App.1960). Until the Florida Supreme Court shows some definitive indication that it intends to change the rule limiting partial performance to actions in equity, we must follow this rule.

Consequently, the statute of frauds bars enforcement of the Dwight–Tobin partnership contract and partial performance does not remove this bar.

### B. *Ellman's Appeal*

■ The requirements for establishing a cause of action for tortious interference with a business relationship are well settled under Florida law:

To plead a prima facie case of tortious interference with a business relationship, a plaintiff must establish: (1) that a business relationship existed, not necessarily evidenced by an enforceable contract; (2) that the defendant knew of the relationship; (3) that the defendant intentionally and unjustifiably interfered with the relationship; and (4) that plaintiff suffered damages as a result of the breach of the relationship. Of course, *the alleged business relationship must afford the plaintiff existing or prospective legal or contractual rights.*

*Jenkins v. Fleet*, 530 So.2d 993 (Fla.Dist. Ct.App.1988) (emphasis added).

Dwight's claim flounders on the "business relationship" requirement. Since the alleged partnership agreement between Dwight and Tobin is unenforceable under the statute of frauds, it affords no legal or contractual rights, and Dwight has alleged no other legally enforceable agreement with which Ellman has interfered. Consequently, there is no business relationship for the purposes of a tortious interference claim.

We, therefore, hold that the district court erred in refusing to grant a judgement notwithstanding the verdict for Ellman.

### C. *Counterclaims*

#### 1. Tobin

■ The first of Tobin's counterclaims concerns a promissory note executed jointly by Dwight and Tobin in November of 1986 evidencing their obligation on a loan totalling $2,400,000 from the Barnett Bank of Naples, Florida. According to Tobin, she personally repaid $2,100,000 of that debt, and Dwight paid nothing. She claims that she is entitled to contribution from Dwight as a joint debtor for his proportionate share of the amount. The jury found for Dwight on this counterclaim and awarded Tobin nothing. She appeals from a denial of her motion for a JNOV.

■ As Tobin accurately observes in her briefs, Florida law presumes that "absent evidence that the parties have agreed to some other distribution of the obligation, ... co-obligors will bear equal shares of the common debt." Dwight, however, presented some evidence at trial from which the jury could have inferred that the two parties had a specific agreement regarding responsibility for the debt. According to Dwight, the two agreed that the

Barnett note would be repaid from profits on their various development ventures, R57–8–9; R57–21–2, or by Tobin personally in the event that these funds were insufficient, R47–137. While the evidence is slim, it is sufficient to sustain a jury finding that the parties agreed to non-equal distribution of debt. Therefore, we find that the district court did not err in refusing to grant Tobin a JNOV on the Barnett Bank note counterclaim.

■ Likewise, we find that the district court did not err in refusing a JNOV on the Laredo National Bank counterclaim. In November of 1985, Dwight and Dr. Robert Oden executed a promissory note to the Laredo National Bank to secure a loan to a closely held corporation owned by the two men. The money was used to purchase an airplane for the corporation. In 1986, Tobin purchased all of Oden's stock in the corporation and assumed his obligations under the note. When the corporation defaulted on the loan, the bank repossessed the plane, and Tobin paid a deficiency totalling $163,111. She brought a counterclaim against Dwight for one half of this amount ($81,550.50), and the jury awarded her $68,-055.

On appeal, Tobin claims that the jury made a mathematical error in calculating her damages. She claims that the jury transposed the numbers and awarded her one half of $136,111 (which is $68,055.50) rather than one half of $163,111 (which is $81,550.50).

We agree with Dwight, however, that there is some evidence in the record to support the jury verdict. Dwight testified at trial that prior to the foreclosure, he alone paid for repairs to the plane necessitated by excessive use by Tobin and that he made several payments on the bank loan. From this, the jury could have concluded that Tobin was entitled to contribution on less than half of the deficiency and may have reduced the award accordingly.

We, therefore, affirm the order of the district court denying Tobin's motion for a judgement notwithstanding the verdict on this issue.[3]

### 2. Ellman

■ On appeal Ellman argues that the district court erred in failing to grant his motion for a judgment notwithstanding the verdict on his claims for breach of fiduciary duty. It appears uncontroverted that Dwight commingled funds of the various Siena Ventures with each other and with personal funds, engaged in a regular course of check kiting that ultimately damaged partnership credit relationships, and abandoned his responsibilities to the Siena Ventures to take advantage of an apparently advantageous business relationship with Tobin. Ellman claims that these acts alone are sufficient to establish a breach of fiduciary duty as a matter of law.

■ While Ellman is correct that any one of these actions alone might establish a breach of fiduciary duty, Florida follows the well-established majority rule that a fiduciary may act in his own benefit and adversely to his partners as long as those to whom the duty is owed give their consent, with full knowledge and after full disclosure. *See Avila South Condominium Ass'n, Inc. v. Kappa Corp.*, 347 So.2d 599, 606–607 (Fla.1977); *Young v. Field*, 548 So.2d 784, 785–786 (Fla.Dist.Ct.App. 1989); *Brent v. Smathers*, 547 So.2d 683, 685 (Fla.Dist.Ct.App.1989).

In this case, there is certainly sufficient evidence in the record to support a finding that Dwight informed Ellman of the commingling, check kiting, and other financial improprieties, that Ellman had full knowledge of these activities, and that he nonetheless consented to them. While Ellman now claims that he did not assent to these actions and that no rational person would have acquiesced to such financially dubious

**3.** We also affirm the jury verdict awarding Tobin one dollar in damages for Dwight's breach of contract for the sale of O.F.W., Inc. stock. We find sufficient evidence in the record to support a jury finding that Tobin suffered no damages as result of Dwight's breach.

Likewise, we affirm the district court's denial of a JNOV on Tobin's fraud claim. While the evidence was disputed, it was sufficient to support Dwight's contention that Tobin was aware of the financial condition of the Siena Ventures when she invested in them.

practices, testimony indicates that the Siena partnerships were in desperate financial straits at this time. Since desperate times often drive rational people to try desperate measures, it is entirely possible that Ellman consented to Dwight's unscrupulous financial practices in the hope that they could rescue his investments. We certainly would not overturn a jury verdict based on such a finding.

Consequently, we affirm the district court's order denying Ellman's motions for a judgment notwithstanding the verdict on his claims against Dwight for breach of fiduciary duty.

#### IV. Conclusion

For the foregoing reasons, we REVERSE the order of the district court denying Tobin's motion for a judgment notwithstanding the verdict based on her statute of frauds claim. We also REVERSE the order of the district court denying Ellman's motion for a judgment notwithstanding the verdict on the ground that Dwight failed to establish the existence of a legally cognizable business relationship.

We AFFIRM the district court's order denying Tobin's motion for a JNOV on her counterclaims. Likewise, we AFFIRM the district court's order denying Ellman's motion for a JNOV on his counterclaims.[4]

Appellee/Cross–Appellant's motion to strike or, in the alternative, to deny judicial notice is hereby DENIED.

---

4. This opinion modifies the Final Judgment as Between Dwight and Tobin as follows: Dwight may recover from Tobin the sum of $0; Tobin may recover from Dwight the sum of $82,-556.50, with interest thereon as provided by the district court.

This opinion modifies the Final Judgment as Between Dwight and Ellman as follows: Dwight may recover from Ellman the sum of $0; Ellman may recover from Dwight the sum of $200,000, with interest thereon as provided by the district court.