GEBAM, INC., Plaintiff,

v.

INVESTMENT REALTY SERIES I, LLC, David Brannen, Guy A. Savage, and G.J. Willem Noltes, Defendants.

Civil Action No. 1:10–CV–4043–AT.

United States District Court, N.D. Georgia, Atlanta Division.

Signed Feb. 21, 2013.

Ann Marie Byrd, Clifton B. Welch, Paul Monnin, DLA Piper LLP (US), Atlanta, GA, Attorneys for Plaintiff(s).

Investment Realty Series I, LLC, Atlanta, GA, pro se.

Matthew Robert Thiry, Mina A. Elmankabady, Davis Matthews & Quigley, Atlanta, GA, for David A. Brannen.

John M. Bolton, III, Hill Hill Carter Franco Cole & Black, Montgomery, AL, Steven James Estep, Cohen Cooper Estep & Allen, LLC, Atlanta, GA, for Guy A. Savage.

G.J. Willem Noltes, Atlanta, GA, pro se.

#### ORDER

AMY TOTENBERG, District Judge.

This matter is before the Court on Plaintiff GEBAM, Inc.'s ("GEBAM") and Defendant David Brannen's cross-motions for summary judgment. [Docs 113 and 120, respectively]. GEBAM argues that it is entitled to summary judgment on its three claims against Defendants David Brannen, Guy A. Savage, and G.J. Willem Noltes (collectively, the "Individual Defendants"), namely aiding and abetting breach of fiduciary duty (Count IX), unjust enrichment (Count VIII) and piercing the corporate veil (Count XI).[1] Conversely, Brannen argues that he is entitled to summary judgment on these same counts.

For the reasons discussed below, GEBAM's motion is **DENIED** and Defendant Brannen's motion is **GRANTED IN PART** and **DENIED IN PART.** The Court **DISMISSES** GEBAM's veil-piercing claim against Defendant Brannen and **DISMISSES,** *sua sponte,* GEBAM's veil-piercing claim against Defendants Savage and Noltes.

### I. PROCEDURAL HISTORY

GEBAM filed a complaint for breach of contract, breach of fiduciary duties, unjust enrichment, conversion, and piercing the corporate veil along with a motion for temporary restraining order on December 13, 2010. The predecessor judge in this matter entered a temporary restraining order ("TRO") on December 13, 2010 and scheduled a hearing on the preliminary injunction motion for December 20, 2010. However, the parties were not able to marshal witnesses for a hearing on December 20, and after a telephone conference, the Court reset the hearing to January 4, 2011, and extended the TRO through that date. The parties later submitted a consent preliminary injunction, which the Court entered on January 4, 2011.

---

1. Technically, "piercing the corporate veil" is not a claim but a means by which Plaintiff might hold the Individual Defendants liable for Plaintiff Investment Realty Series I, LLC's ("IRS") alleged misconduct. *See infra* n. 21.

After one extension of time for their responsive pleadings, Investment Realty Series I, LLC ("IRS") and the Individual Defendants filed motions to dismiss the complaint on January 20, 2011. Plaintiff filed its first amended complaint on February 7, 2011, rendering the first motion to dismiss moot. Accordingly, IRS and the Individual Defendants filed motions to dismiss certain claims in the first amended complaint on February 24, 2011.

On April 15, 2011, Defendants' counsel Krevolin & Horst, LLC, moved to withdraw. (Doc. 41.) The Court granted the motion to withdraw on May 13, 2011, leaving IRS without representation. (Doc. 43.) Thus, the Court ordered IRS to obtain new counsel pursuant to Local Rule 83.1(E)(2)(b)(I). (*Id.*) On June 10, 2011, the Court observed that IRS had not complied with the May 13 Order, and directed it to obtain new counsel or face an entry of default. (Doc. 44.) IRS did not obtain counsel, and on June 30, 2011, the Clerk entered a default against IRS. On August 11, 2011, GEBAM filed a motion for default judgment against IRS. (Doc. 55.)

Without addressing GEBAM's motion for default judgment, the Court ruled on the Defendants motions for partial dismissal on September 27, 2011. (Doc. 60.) The Court dismissed GEBAM's breach of fiduciary duty claim (Count VI) as to Defendants Savage, Noltes, and Brannen only. The Court also dismissed the claim for conversion (Count X). The Court allowed GEBAM to proceed with its breach of fiduciary duty claim against IRS (Count VI) and claims for aiding and abetting breach of fiduciary duty (Count IX), unjust enrichment (Count VIII), and piercing the corporate veil (Count XI) against Savage, Noltes, and Brannen. The Court also de-

clined to dismiss GEBAM's requests for an accounting (Count V) and constructive trust (Count XII).

The Court then held a hearing on GEBAM's motion for default judgment against IRS on February 6, 2012, and two follow-up telephone conferences in April 2012. On August 17, 2012, the Court granted GEBAM a default judgment against IRS on its breach of contract claim. (Doc. 167.) Consistent with the standard of review for default judgment motions, the Court presumed true the facts pled in GEBAM's Complaint, but only for purposes of GEBAM's default judgment motion against IRS. (Doc. 167 at 3–6 (citing *Buchanan v. Bowman*, 820 F.2d 359, 361 (11th Cir.1987)).) The Court held that the facts as pled in the Complaint, assumed true only with regard to IRS due to its default, established IRS's liability for breach of the LLC Agreement. (Doc. 167 at 6.) Accordingly, the Court enforced Section 4.7 of the LLC agreement and transferred IRS's interest in the Company to GEBAM. The Court also entered judgment against IRS in the amount of $595,117.[2]

In the interim, GEBAM and Defendant Brannen filed the instant motions for summary judgment, which are now ripe for adjudication.

## II. STANDARD FOR SUMMARY JUDGMENT

Summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of

---

**2.** Although not expressed in the Court's default judgment Order, the Court properly directed entry of judgment against IRS pursu-

ant to Rule 54(b) of the Federal Rules of Civil Procedure because there was no just reason for delay in doing so. *See* Fed.R.Civ.P. 54(b).

law." Fed.R.Civ.P. 56(c). The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56 advisory committee's note). Summary judgment is appropriate when the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Tidmore Oil Co., Inc. v. BP Oil Co./Gulf Prods. Div., a Div. of BP Oil Co.*, 932 F.2d 1384, 1387–88 (11th Cir.1991). The substantive law governing the action determines whether an element is essential. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *DeLong Equip. Co. v. Washington Mills Abrasive Co.*, 887 F.2d 1499, 1505 (11th Cir.1989).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. The burden then shifts to the non-movant to establish, by going beyond the pleadings, that there is a genuine issue as to facts material to the non-movant's case. *Thompson v. Metropolitan Multi–List, Inc.*, 934 F.2d 1566, 1583 n. 16 (11th Cir. 1991); *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1477 (11th Cir.1991). A dispute of material fact "is 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. 2505. However, if the nonmoving party's response to the summary judgment motion consists of nothing more than mere conclusory allegations, then the court must enter summary judgment in the moving party's favor. *Peppers v. Coates*, 887 F.2d 1493, 1498 (11th Cir.1989). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, [then] there is no genuine issue for trial." *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348; *see also Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. 2505; *Johns v. Jarrard*, 927 F.2d 551, 556 (11th Cir.1991).

In assessing whether the movant is entitled to summary judgment in its favor, the district court must review the evidence and all reasonable factual inferences arising from it in the light most favorable to the nonmoving party. *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir.1992); *Ryder Int'l. Corp. v. First Am. Nat'l. Bank*, 943 F.2d 1521, 1523 (11th Cir.1991). The Court must avoid weighing conflicting evidence. *Liberty Lobby*, 477 U.S. at 255, 106 S.Ct. 2505; *McKenzie v. Davenport–Harris Funeral Home*, 834 F.2d 930, 934 (11th Cir.1987). A mere "scintilla" of evidence supporting the opposing party's position, however, will not suffice. *See, e.g., Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir.1990). Nevertheless, where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment." *Barfield v. Brierton*, 883 F.2d 923, 933–34 (11th Cir.1989) (citation omitted).

■ The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply requires a determination of whether either of

the parties deserves judgment as a matter of law on the facts that are not disputed. *Am. Bankers Ins. Group v. United States,* 408 F.3d 1328, 1331 (11th Cir.2005). The Court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration. *Id.* The Eleventh Circuit has explained that "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley,* 744 F.2d 1553, 1555 (11th Cir.1984). Cross-motions may, however, be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the controlling legal theories and material facts. *Id.* at 1555–56.

## III. FACTUAL BACKGROUND

This statement of facts does not represent actual findings of fact. *In re Celotex Corp.,* 487 F.3d 1320, 1328 (11th Cir.2007). Instead, the Court has provided the statement simply to place the Court's legal analysis in the context of this particular case or controversy. In addition, as noted above, when deciding a motion for summary judgment, the Court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. *See Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.,* 496

F.3d 1231, 1241 (11th Cir.2007) (observing that, in connection with summary judgment, court must review all facts and inferences in light most favorable to nonmoving party).

### A. The Real Estate Investment Venture

This case involves a real estate investment venture that succumbed to internal conflict arising from the managing member's alleged self-dealing and cavalier disregard for its contractual and fiduciary duties. In 2006, Plaintiff GEBAM[3] and Defendant Investment Realty Series I ("IRS") created a Delaware limited liability company called IRH Properties, LLC (the "Company"). (Feb. 6, 2012 Hrg. Ex. 1 ("Amended and Restated Limited Liability Company Agreement") or ("LLC Agreement").)[4] The purpose of this venture was to invest in certain real estate projects including three multifamily investment properties: Remington Park Apartments in Houston, Texas ("Remington Park"); Paces Park Apartments in Decatur, Georgia ("Paces Park"); and Brentmoor Apartments in Raleigh, North Carolina ("Brentmoor"). (LLC Agreement § 2.5; *Id.* at 80 ("Schedule 6.1A"); Individual Defs.' Resp. Pl.'s Statement Material Facts ("IDRSMF") ¶ 7.)[5]

The LLC Agreement defined the relationship of the two sole members of the Company, referring to GEBAM as the

**3.** GEBAM is a subsidiary of General Electric Real Estate. (Testimony of Renee Bergeron, Feb. 6, 2011 (Doc. 136) at 16.)

**4.** In their summary judgment materials, the parties refer to the exhibits introduced at the February 6, 2012 default judgment hearing in this matter, available on the docket at Doc. 98.

**5.** The Individual Defendants in this case are David Brannen, G.J. Willem Noltes, and Guy

A. Savage. Each of the Individual Defendants filed his own response to Plaintiff's Statement of Uncontested Material Facts ("Pl.'s SMF") (Doc. 113–2). (*See* Docs. 119, 121, and 123 respectively). Where all three Individual Defendants respond in essentially the same manner, the Court refers to this response as the ("IDRSMF"). Otherwise, the Court will refer to the specific Defendant's response as, for example, "Brannen's RSMF."

"GECC Member" [6] and IRS as the "Developer Member." (LLC Agreement at 7.) [7] The LLC Agreement vested the Developer Member, Defendant IRS, with general management authority over the company's and its subsidiaries' business operations. (*See id.* at 10 (defining "Manager" as, initially, the "Developer Member"); *id.* § 4 (describing the Manager's general management authority).) However, for certain "Major Decisions" defined by the LLC Agreement (including sale or mortgaging of assets, expenditure not included in the Operating Budget, approving property management companies, and "outside acts" not within the business purpose of the company), IRS was required to obtain GEBAM's approval. (*Id.* § 4(b).)

The LLC Agreement also defined how GEBAM and IRS would share in capital and residual funds. The agreement defined the Capital Sharing Ratio as the "percentages in which the Members participate in, and bear, certain Company items." (LLC Agreement at 8.) [8] After all distributions were made consistent with these ratios and the relevant distribution scheme (Article 8 of the LLC Agreement), IRS and GEBAM were to split all residual distributions evenly. (LLC Agreement at 12.)

Finally, the LLC Agreement provided that the Company would contract with Investment Realty, LLC (the "Property Manager"), an affiliate of IRS, to manage each project. (LLC Agreement § 4.12.) [9]

Furthermore, "[e]ach management agreement shall provide that Property Manager shall be paid, as a Company expense, a fee not to exceed 3.5% of Operating Revenues and shall be on such other terms and conditions as may be approved by GECC Member and Manager." (LLC Agreement § 4.12.)

## B. The Individual Defendants

Defendants David Brannen, Guy A. Savage, and G.J. Willem Noltes (collectively, the "Individual Defendants") have a significant, albeit arguably indirect, interest in the Company. The LLC Agreement recognizes the Individual Defendants as "Key Principals" of the Company, but does not define what a "Key Principal" is. (LLC Agreement at 10.) However, each Individual Defendant has a stake in the managing member of the Company, IRS. For example, Defendants Noltes and Savage admit that they are the sole members of an entity called Investment Realty Holdings, LLC, which in turn holds a 40% stake in IRS. (Nolte's RSMF ¶ 3; Savage RSMF ¶ 3.) Likewise, David Brannen effectively holds the interest in the other 60% through a limited partnership called PB Surf, Ltd. ("PB Surf"). (Brannen's RSMF ¶ 4.) Brannen admits that he holds 100% of the equity in each of the three general partners and six limited partners of PB Surf. The following chart summarizes this corporate structure:

---

**6.** GECC stands for "General Electric Capital Corporation." (LLC Agreement § 11.11.)

**7.** The page number in the LLC Agreement corresponds to the page in the PDF document on the docket, not the page of the agreement itself.

**8.** For Paces Park and Remington Park, this ratio was 20% for IRS and 80% for GEBAM. (LLC Agreement at 80 ("Schedule 6.1A").)

For Brentmoor, it was 10% for IRS and 90% for GEBAM. (*Id.*)

**9.** GEBAM states without support that Investment Realty, LLC is an affiliate of Defendant Savage in particular. (Pl.'s SMF ¶ 14.) For purposes of the instant motion, it is immaterial whether Investment Realty, LLC was an affiliate of IRS or Defendant Savage.

## C. Alleged Misconduct

By 2010, the Company did not have adequate working capital with which to cover past due payables, unpaid mortgage payments, and operating shortfalls. (IDRSMF ¶ 19.) The parties agree that, because of this inadequacy in capital, GE-BAM was forced to satisfy over $2,000,000 in capital calls since January 2010. (*Id.*) The Individual Defendants did not answer these capital calls. (*Id.*)

GEBAM contends that IRS and the Individual Defendants mismanaged the Company, and this mismanagement led to this inadequacy of capital. In particular, GE-BAM alleges that the Individual Defendants engaged in two types of unauthorized actions. First, GEBAM alleges that the "Individual Defendants ... made numerous unauthorized disbursements of Company funds to themselves and their affiliates. (Pl.'s SMF ¶ 10.) Second, GE-BAM states that the Property Manager (an IRS affiliate) improperly charged the Company more than $370,000 in over-allocated management costs and excess fees. (Pl.'s SMF ¶ 14.) The Individual Defen-

dants appear to admit that the disbursements and charges occurred, but Defendants Brannen and Savage deny that they were "unauthorized" and Defendant Noltes asserts that he was not even aware of them. (Brannen's RSMF ¶ 10; Noltes's RSMF ¶ 10; Noltes RSMF ¶ 10.) Thus, the focus of the Court's attention is on evidence supporting or contradicting GE-BAM's assertion that the Individual Defendants engaged in unauthorized actions. The Court begins by analyzing evidence of the alleged unauthorized disbursements and then separately considers the alleged over-allocated management costs and fees.

### 1. Disbursements

■ To support its contention that the Individual Defendants engaged in and reaped the benefit of unauthorized disbursements, GEBAM relies solely upon three types of evidence: (1) audit reports by KPMG, LLP's ("KPGM") and audit spreadsheets produced by RSM McGladrey, Inc.'s ("McGladrey"); (2) the testimony of Renee Bergeron, a Senior Asset Manager for GE Capital Real Estate, which provides oversight for assets and

equity interests owned by GEBAM; and (3) the Individual Defendants' purported admissions. (Pl.'s SMF ¶¶ 10–15.)

First, while the audit materials show that disbursements occurred, GEBAM fails to direct the Court to any specific aspect of or items in these materials supporting its contention that the disbursements were unauthorized. For example, in a 2008 Report KPMG gave to GEBAM, KPMG recognizes that in fiscal year 2006, the Company provided two interest-free loans, one for $135,000 to a property that IRS owned and another for $108,000 "to one of the investors in IRS" (i.e., either Noltes or Savage). (Feb. 6 Hrg. Ex. 2 ("KPMG Report") at 10.) KPMG explains that because the amounts were due on demand and did not bear interest, KPMG categorizes these disbursements as "accounts receivable." (KPMG Report at 10; *see also* IDRSMF ¶ 11.) Defendants Brannen and Savage admit that these disbursements were not made in accordance with applicable GEBAM/IRS capital ratios. (Brannen's RSMF ¶ 11; Savage's RSMF ¶ 11.) However, the Individual Defendants deny that the disbursements were unauthorized. (*See, e.g.*, IDRSMF ¶ 10.)[10] More importantly, contrary to GEBAM's characterization, this KPMG report does not specifically "reveal[ ]" that the disbursements were "unauthorized."

Likewise, sometime in early 2010, GEBAM received a KPMG Draft Report, dated December 10, 2009, also showing certain disbursements. (Bergeron Aff. ¶ 10;

Feb. 6 Hrg. Ex. 3 ("KPMG Draft Report").) In particular, this report states that, in addition to the $135,000 loaned to a property owned by IRS in 2006 (mentioned above), the Company loaned $212,000 in 2007. (KPMG Draft Report at 12; IDRSMF ¶ 11.) The KPMG Draft Report also recognizes a total of $284,000 loaned in fiscal years 2006 and 2007 to one of the investors in IRS (i.e., Noltes or Savage). (KPMG Draft Report at 12; IDRSMF ¶ 11.) Again, KPMG categorizes these loans as "accounts receivable" because the "amounts are due on demand and do not bear interest." (KPMG Draft Report at 12; IDRSMF ¶ 11.) The Individual Defendants admit that none of these loans were reduced to a note or other written obligation. (IDRSMF ¶ 12.)[11] However, again they deny that the disbursements were unauthorized. And just as before, GEBAM failed to direct the Court to (and the Court was unable to find) any aspect or page of the KPMG Draft Report characterizing the disbursements as "unauthorized."

GEBAM then turns to a series of spreadsheets produced by RSM McGladrey, Inc. ("McGladrey") in 2010 and asserts that these spreadsheets "reveal[ ] improper disbursements totaling in excess of $2.7 million." (Pl.'s SMF ¶ 14.) GEBAM hired McGladrey to review the Company's books and records after GEBAM first raised the issue of IRS's alleged unauthorized disbursements in an April 2010 tele-

---

10. The Individual Defendants support their position with their own sworn testimony and Defendant Savage's responses to Plaintiff's Request for Admissions. (*See, e.g.*, Brannen Aff. (Doc. 119–1) ¶¶ 18, 21–23; Savage Aff. (Doc. 124 at 20–23) ¶ 12; Savage's Resp. Pl.'s RFA (Doc. 124 at 27–31) ¶¶ 1–6; Noltes Aff. (Doc. 124) ¶ 10, Ex. 1.)

11. Defendant Noltes objects to Plaintiff's statement of uncontested material fact num-

ber 12 to the extent it calls for a legal conclusion. Evidently, Noltes does not otherwise dispute the substance of this statement, which reads, "KPMG further confirmed that, although each disbursement was made by check or wire, none of the putative accounts receivable were reduced to a note or other written obligation so as to make them readily enforceable by the Company against the Individual Defendants." (Pl.'s SMF ¶ 12.)

phone conference with Savage. (Bergeron Aff. ¶ 15; *see also* IDRSMF ¶¶ 13, 16.) McGladrey then produced four Microsoft Excel files, each containing multiple spreadsheets with extensive data. (Feb. 6 Hrg. Ex. 23 ("McGladrey Spreadsheets").) [12] GEBAM does not direct the Court to any particular page or line item of these spreadsheets, or to the testimony of an accountant who prepared the spreadsheets, which supports its position that the disbursements were unauthorized. The Court is not obligated to "scour the record" to find one. *See Tomasini v. Mt. Sinai Med. Ctr. of Fla.*, 315 F.Supp.2d 1252, 1260 n. 11 (S.D.Fla.2004). In any case, the Court did review the McGladrey spreadsheets and found nothing addressing whether the disbursements were or were not authorized and, in fact, no obvious way to determine the total amount of disbursements. This was unsurprising. Indeed, on February 6, 2012, GEBAM's counsel represented to the Court that while McGladrey supports GEBAM's allegation regarding the *amount* of disbursements, McGladrey "wouldn't be of much help" in assessing whether the disbursements were *disclosed* (i.e. authorized). (Tr. Feb. 6 Hrg. (Doc. 136) at 139.) GEBAM's counsel was correct: The McGladrey spreadsheets do not address whether any transaction was disclosed or authorized.

Next, GEBAM relies on the affidavit of Renee Bergeron, a Senior Asset Manager for GE Capital Real Estate, the parent company of GEBAM that provides oversight for assets and equity interests owned by GEBAM. Although Ms. Bergeron was not involved in the Company at the time of the distributions (Tr. Feb. 6 Hrg at 136),[13] she swears repeatedly that they were unauthorized (*See, e.g.*, Bergeron Aff. ¶¶ 9–10, 13, 14 ("[D]efendants ... [did not] seek or obtain GEBAM's approval to make the unauthorized disbursements.").) Consistent with GEBAM's approach to this case, Ms. Bergeron provides only a sweeping citation to the audit materials, referencing no specific part supporting her characterization of the distributions as "unauthorized." (*See, e.g.*, Bergeron Aff. ¶¶ 9–10, 18, 23.) Moreover, although Defendant Savage identified specific GEBAM employees whom he contends authorized the disbursements (Savage's Resp. Pl.'s RFA (Doc. 124) ¶¶ 1–6), GEBAM did not present the Court with any testimony from them, or from any other GEBAM employee who worked with the Company at the time of the alleged distributions, that might clearly contradict Savage's statement.

Finally, GEBAM asserts that the Individual Defendants have admitted liability. (*See* Pl.'s SMF ¶¶ 20–30.) To support this, GEBAM relies on three things: (1) a statement in a telephone conference in this matter before the predecessor judge, Chief Judge Julie Carnes; (2) two exhibits introduced into evidence at the default judgment hearing on February 6, 2012; and (3) alleged admissions in two state court cases involving the Individual Defendants. This evidence does not resolve the factual dispute as to whether the Individual Defendants assisted in any unauthorized transactions.

12. GEBAM also refers to Ex. 23A, a summary spreadsheet of McGaldrey's findings. No party has contested the authenticity of these spreadsheets.

13. Defendants Brannen and Savage state that Ms. Bergeron "testified in February [that] she was not involved in the Company during the time of the distributions." (Brannen's RSMF ¶ 10; Savage's RSMF ¶ 10.) Neither of these defendants directs the Court to where in the 204–page transcript Bergeron so testified, forcing the Court to do their job for them.

For example, in the telephone conference with Judge Carnes, the Judge asked Defendants' counsel what their defense would be in this case. Counsel responded that GE asset managers (i.e., GEBAM) agreed in 2006 to allow for the disbursements. (Tr. Dec. 20, 2010 Telephone Conference (Doc. 11) at 6–7.) Counsel explained that the disbursements were "booked as loans from the company to the people who received the distribution, who are my clients." (*Id.* at 7.) Upon questioning, Defendants' counsel agreed that the loans were not "in the interest of the Company." (*Id.* at 8.) This does not mean, however, that GEBAM did not approve them.

Likewise, the two exhibits GEBAM refers to do not clear up any factual issue as to whether GEBAM authorized the disbursements. In one, a July 7, 2010 email to Brannen, Savage expressed concern about the distributions and acknowledged that he and Noltes "signed on all these docs with you." (Feb. 6, 2012 Hrg. Ex. 44.) This expression of concern, however, does not address whether GEBAM also approved of the transactions. And although the email suggests Noltes was previously aware of the disbursements, it does not constitute an admission of liability. The second exhibit is a September 27, 2010 email to a GE representative wherein Noltes asks for "12 months to restore the funds." (Feb. 6 Hrg. Ex. 45.) However, in the same breath, Noltes asserts that all the disbursements "were posted on the balance sheet over the last 4 years with the full knowledge of GE and its auditors." The Court cannot consider these exhibits as admissions of liability, even if they contain relevant and probative evidence.

Lastly, GEBAM refers broadly to two state court cases in which the Individual Defendants lodge claims against one another. (Pl.'s SMF ¶¶ 21–30.) According to GEBAM, the "elaborate finger-pointing" in these actions somehow amounts to an admission of liability. To the extent GEBAM has referenced a specific portion of the record in these two state court cases, the Court has reviewed them and found no evidence of admissions of liability.[14] Again, these cases suggest that the disbursement may have been unauthorized, but they do not conclusively resolve this factual dispute.

For their part, the Individual Defendants chiefly rely on their word. Defendants Brannen and Savage refer to Savage's sworn statements naming specific GEBAM employees who purportedly authorized the disbursements. (*See, e.g.*, Brannen's RSMF ¶¶ 10, 14; Savage's RSMF ¶¶ 10, 14.)[15] Likewise, Defendant Noltes asserts that he had no knowledge of any disbursements to Defendant David Brannen, Brannen's affiliated company PB Surf Ltd., Guy Savage, or other companies the Individual Defendants owned. (Noltes Aff. ¶ 9.) Thus, a conflict of evidence exists as to whether the Individual Defendants each participated in *unauthorized* disbursements.

14. GEBAM first states, "Party admissions in the [state court cases] support GEBAM's motion for summary judgment against the Individual Defendants in this case." (Pl.'s SMF (Doc. 113–2) ¶ 22.) In support of this proposition, GEBAM refers broadly to two state court cases, providing no specific place in the record where such admissions occurred. GEBAM then provides *a selection of citations* that purportedly constitute admissions of liability. The Court thus presumes that the only aspects of the state court cases to support GEBAM's position are those to which it specifically refers. (*See* Pl.'s SMF (Doc. 113–2) ¶¶ 23–29.) The Court will not scour the records of these state court cases to find others.

15. Just as GEBAM failed to provide testimony from these employees, so too did the Individual Defendants.

## 2. *Management Fees*

■ A similar evidentiary conflict permeates GEBAM's allegation of overpaid management fees. According to GEBAM, the McGladrey Spreadsheets "reveal[ ] ... more than $370,000 in over-allocated management costs and excess fees improperly charged to the Company by the Property Manager—an affiliate of Defendant Savage." (Pl.'s SMF ¶ 14.) Again, GEBAM fails to reference where in the report this fact is "revealed," and the Court did not find it on its own. In any case, it appears GEBAM's basis for alleging that the management costs were "over-allocated" and in "excess" is its contention that the Company paid 4% for the management of the Brentmoor Apartments.[16] (*See* Pl.'s SMF ¶ 14.) The LLC Agreement and the March 2007 Brentmoor Leasing Agreement both allow only 3.5%. (LLC Agreement § 4.12; Feb. 6 Hrg. Ex. 43 (Brentmoor Leasing Agreement) § 4.01.) However, Defendants Brannen and Savage have produced an email from a GE employee, dated November 21, 2007, approving this higher percentage amount. (Brannen's RSMF Ex. C.) Thus, the evidence remains in dispute as to whether GEBAM authorized a 4% payment for the management of this property.

## IV. ANALYSIS

GEBAM has moved for summary judgment on its three claims against the Individual Defendants:

(1) aiding and abetting breach of fiduciary duty (Count IX);

(2) unjust enrichment (Count VIII); and

(3) piercing the corporate veil (Count X).

Brannen is the only defendant who has filed a cross-motion for summary judgment. However, the Court will consider granting, *sua sponte*, summary judgment in favor of the other Individual Defendants on the veil-piercing claim because GEBAM has filed a summary judgment motion addressing the same issues upon which the Court makes its determination. *See Flood v. Young Woman's Christian Ass'n of Brunswick, Ga., Inc.,* 398 F.3d 1261, 1267 (11th Cir.2005); *Burton v. City of Belle Glade,* 178 F.3d 1175, 1204 (11th Cir.1999). Considering that GEBAM has also defended itself against Brannen's motion for summary judgment, the Court determines that GEBAM has had an adequate opportunity to demonstrate why summary judgment should not be granted in the Individual Defendants' favor on the veil-piercing claim. *See Burton,* 178 F.3d at 1204.

### A. Aiding and Abetting Breach of Fiduciary Duty

■ GEBAM first argues that the Individual Defendants aided and abetted IRS's breach of fiduciary duty owed to GEBAM. To state a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must show: "(1) the existence of a fiduciary relationship; (2) the fiduciary breached its duty; (3) a defendant, who is not a fiduciary, knowingly participated in the breach; and (4) damages to the plaintiff resulted from the concerted action of the fiduciary and the nonfiduciary." *Kelly v. Blum,* No. 4516–VCP, 2010 WL 629850, at *15 (Del. Ch. Feb. 24, 2010); *accord Malpiede v. Townson,* 780 A.2d 1075, 1096–97 (Del. 2001).[17] The Court has previously decided

---

16. Noltes swears that he had no access to records, including property management agreements, for Defendant Savage's property management company and thus did not know what fees the management company was collecting for its services. (Noltes Aff. ¶ 11.)

17. As discussed in this Court's Order of September 27, 2011, the parties agree that Dela-

that based on IRS and GEBAM's status as members of the LLC, IRS and GEBAM shared a fiduciary relationship. (Doc. 60 at 7.) The parties do not dispute this. (Brannen's Resp. Pl.'s Mot. Summ. J. (Doc. 118) at 2; Savage's Resp. Pl.'s Mot. Summ. J. (Doc. 123) at 2; Noltes Resp. Pl.'s Mot. Summ. J. (Doc. 121) at 4–6 (taking issue only with the "knowingly participated" prong of the claim).) The Court must next consider whether IRS breached this duty and whether the Individual Defendants knowingly participated in this breach.

### 1. Whether IRS Breached its Fiduciary Duty Owed to GEBAM

 To establish that IRS breached its fiduciary duty, GEBAM must show two things: "that a self-interested transaction occurred, and that the transaction was unfair to [GEBAM]." *In re Fedders N. Am. Inc. v. Goldman Sachs Credit Partners L.P. et al.*, 405 B.R. 527, 540 (Bankr.D.Del. 2009) (quoting *Joyce v. Cuccia*, No. CIV.A. 14953, 1997 WL 257448, at *5 (Del.Ch. May 14, 1997)). Even if a self-interested transaction occurred, an informed party who approves of the transaction cannot later claim the transaction is unfair. *See* Callison and Sullivan, Partnership Law & Practice, § 12:13 Waiver and ratification ("Breaches of partnership fiduciary duties may be waived or ratified if the waiver or ratification is specific as to the breach, is based on full disclosure of material facts, and is not obtained by fraud or coercion."); *Dwight v. Tobin*, 947 F.2d 455, 461 (11th Cir.1991) (recognizing the "well-established majority rule that a fiduciary may act in his own benefit and adversely to his partners as long as those to whom the duty is owed give their consent, with full knowledge after full disclosure").

GEBAM has sufficiently established self-interested transactions occurred, although the contours of such transactions remain unclear. Uncontroverted evidence shows that the Company made interest free loans to an IRS affiliate and at least one of the Individual Defendants. In addition, IRS paid more than the contractually allowed percentage for property management to a company affiliated with IRS. As the counsel for Defendants has stated, it was "not in the interest of [GEBAM] to have [Defendants] take that money out." (Feb. 6 Hrg. Ex. 24 at 8.) This appropriation of Company resources for its own benefit, and the benefit of IRS's affiliates, is a "classic example of self-dealing." *PT China LLC v. PT Korea LLC, et al.*, No. 4456–VCN, 2010 WL 761145, at *7 (Del. Ch. Feb. 26, 2010).

However, GEBAM has failed to address and resolve all factual disputes regarding the fairness of these transactions. In their brief in response to GEBAM's Motion for Summary Judgment, Defendants Savage and Brannen argue that because GEBAM knowingly authorized the allegedly wrongful transactions when they occurred, GEBAM cannot now claim they were unfair. (*See, e.g.*, Savage's Resp. Mot. Summ. J. (Doc. 123) at 2–4; Brannen's Resp. Mot. Summ. J. (Doc. 118) at 1–4.) In response, GEBAM does not contest this legal principle, implicitly recognizing its legitimacy. *See also Dwight*, 947 F.2d at 461 (recognizing that a fiduciary's informed consent to a transaction might preclude its later claim of a breach of fiduciary duty). Instead, GEBAM only challenges the Individual Defendants' position factually, arguing that there is insufficient evidence of the authorization. This is not so.

As discussed above, Defendants Savage and Brannen swear in affidavits that GE-

ware law should apply to the claims at issue here. (Doc. 60 at 6.)

BAM approved the relevant transactions and state at least some factual basis for this assertion. (Savage's Resp. Pl.'s RFA (Doc. 124) ¶¶ 1–6; Brannen's Aff. (Doc. 119–1) ¶¶ 22–23.) Their position is also consistent with what they have been saying since this dispute arose. For example, in September 27, 2010, Defendant Noltes reminded GEBAM that allegedly wrongful disbursements were effectuated with GEBAM's full knowledge. (Feb. 6 Hrg. Ex. 45.) Furthermore, Defendant Savage has identified the specific individuals at GEBAM who purportedly authorized the transactions. (Savage Resp. RFA (Doc. 124) ¶¶ 1–6.) In summary, GEBAM had set out in its First Amended Complaint to prove that the Defendants "profit[ed] financially from their fiduciary position *without the knowledge or consent of the Company and GEBAM.*" (*See* First Am. Compl. (Doc. 27) ¶ 144 (emphasis added).) They have simply failed to make their case on summary judgment, leaving a genuine issue of fact as to whether GEBAM authorized the transactions with full knowledge, and thus whether the transactions were unfair.

GEBAM responds by arguing that the Individual Defendants cannot rely on their own "self-serving" affidavits in challenging its summary judgment motion. (Pl.'s Reply (Doc. 139) at 4 (citing *Ellis v. England,* 432 F.3d 1321, 1326 (11th Cir.2005); *Smith v. Fed. Exp. Corp.,* 191 Fed.Appx. 852, 855 (11th Cir.2006)).) This is also not so. As the Eleventh Circuit recently explained, "[A] case should be put to the jury if there is any genuine issue of material fact, including one created solely by the testimony of a party." *Feliciano, et al. v. City of Miami Beach, et al.,* 707 F.3d 1244, 1247 (11th Cir.2013). In *Feliciano,* the Eleventh Circuit recognized that summary judgment may be appropriate where the nonmovant relies on conclusory assertions based entirely on subjective belief. *Id.* at

1253. On the other hand, non-conclusory, objective accounts of events may create a genuine issue of fact and thus preclude the entry of summary judgment. *Id.* Here, the Individual Defendants swear they either did not know of the disbursements or that GEBAM approved them, and Savage has identified the specific GEBAM representatives whose approval he purportedly obtained. This testimony is neither conclusory nor subjective. Likewise, GEBAM swears it never authorized the disbursements. The contradiction between GEBAM's position and the Individual Defendants' regarding authorization is "a classic swearing match, which is the stuff of which jury trials are made." *Feliciano,* 707 F.3d at 1253. Thus, this testimony is sufficient to create a genuine issue of fact as to whether GEBAM authorized the disbursements.

GEBAM also urges the Court to disregard the Individual Defendants' testimony regarding GEBAM's authorization of the disbursements, asserting that this testimony is simply not plausible.

> The notion that GEBAM approved disbursements to third parties that would deplete the Company's working capital—which, among other things services the Company's debt for the benefit of *both* GEBAM and IRS I—to the point of requiring a $2 *million* capital contribution by GEBAM simply defies all logic.

(Pl.'s Reply (Doc. 139) at 4.) First, it is inappropriate for the Court to test the veracity of a witness's testimony on summary judgment. *Feliciano,* 707 F.3d at 1252 ("Even if a district court believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices." (internal quotation marks omitted) (quoting *Miller v. Harget,* 458 F.3d 1251, 1256 (11th Cir.2006))). In addition, the Court is not convinced that GE-

BAM's approval of the disbursements here "defies all logic." GEBAM has failed to make clear precisely what disbursements were made and to whom. As discussed earlier, the McGladrey Spreadsheets do not clearly show the nature of the alleged disbursements of over $2 million. The Court must focus on only the evidence that is clear: evidence that the Company made several interest-free loans to certain Individual Defendants or their affiliates. These loans do not total over $2 million. Moreover, it is not inherently illogical for business partners to provide interest-free loans to one another. The Court therefore rejects GEBAM's request to disregard the Individual Defendants' testimony.

This is not to say that the Individual Defendants' testimony at trial about GE-BAM's authorization will be a cake walk. Contrary to Defendant Brannen's arguments, the same deficiencies afflicting GE-BAM on the issue of authorization will pose challenges to the Individual Defendants at trial. They have yet to bring forth testimony from a GEBAM employee confirming the authorization of the transactions at issue. Moreover, when a jury hears the accusations the Individual Defendants have lodged against one another in other cases, their attestations of innocence—upon which they substantially rely—will no doubt lose credibility.

**2. Whether the Individual Defendants' Knowingly Participated in the Breach**

 This factual dispute regarding GEBAM's authorization also creates a question as to whether any of the Individual Defendants "knowingly participated" in

the breach. To prove that a defendant has "knowingly participated" in a breach of fiduciary duty, a plaintiff must show that "the third party act[ed] with the knowledge that the conduct advocated or assisted constitute[d] such a breach." *Malpiede*, 780 A.2d at 1097. Thus, merely showing that the non-fiduciary knew certain actions occurred is insufficient. Rather, to support an aiding and abetting claim, a plaintiff must also show that the non-fiduciary knew the actions were a breach of a fiduciary duty. *Id.; see also In re Centennial Textiles, Inc.*, 227 B.R. 606, 612 (Bankr.S.D.N.Y.1998) ("A person knowingly participates in a breach of fiduciary duty if he (1) knows that the primary violator is a fiduciary, (2) knows that the primary violator's conduct is a breach of his fiduciary duty, and (3) affirmatively assists or conceals the breach.") (applying New York law);[18] *Binks v. DSL.net, Inc., et al.*, No. 2823–VCN, 2010 WL 1713629, at *10 (Del.Ch. Aug. 18, 2009) ("The standard for an aiding and abetting claim is a stringent one, one that turns on proof of scienter of the alleged abettor.").[19] Although GEBAM could satisfy this element inferentially, *see Crescent/Mach I Partners, L.P. v. Turner*, 846 A.2d 963, 990 (Del.Ch. 2000), to prevail on this claim on summary judgment, it must show that no dispute of material fact exists as to whether the Individual Defendants actually "knowingly participated" in the breach.

Here, however, as previously discussed a question of fact remains as to whether the Individual Defendants knew that IRS's disbursements or payment of management fees was a breach of a fiduciary duty.

**18.** This definition is consistent with the definition of "knowingly participated" in Delaware law. *See Malpiede*, 780 A.2d at 1097.

**19.** The Court recognizes that the quote from *Binks* is *dicta*. However, *Binks* is not the only Delaware case to recognize that an aiding and

abetting claim is essentially a civil conspiracy claim. *See, e.g., Weinberger v. Rio Grande Indus., Inc.*, 519 A.2d 116, 131 (Del.Ch.1986) ("A claim for civil conspiracy [is] sometimes called "aiding and abetting." ").

Indeed, according to Savage and Brannen, GEBAM authorized the transactions. And Noltes swears he was unaware of the transactions entirely. A reasonable jury could conclude that all three Defendants knowingly participated in the breach, but based on their testimony, a reasonable jury could also conclude otherwise: that the Individual Defendants believed that, by seeking and obtaining GEBAM's approval, IRS did not breach its fiduciary duties to GEBAM.

For the foregoing reasons, the Court determines that a genuine issue of fact exists as to whether IRS breached its fiduciary duty to GEBAM and whether the Individual Defendants knowingly participated in this breach. Thus, the Court **DENIES** both GEBAM's and Brannen's summary judgment motions on the aiding and abetting claim.[20]

## B. Piercing the Corporate Veil

■ GEBAM next seeks to pierce IRS's corporate veil under a theory that it was an alter ego and mere instrumentality for Defendants Brannen, Savage, and Noltes. This veil-piercing claim rests on a finding that IRS was a "sham and exist[ed] for no other purpose than as a vehicle for fraud." *In re Sunstates Corp. S'holder Litigation,* 788 A.2d 530, 534 (Del.Ch.2001) (quoting *Wallace ex rel. Cencom Cable Income Partners, II, Inc. v. Wood,* 752 A.2d 1175,

1184 (Del.Ch.1999)). Thus, GEBAM asks the Court to disregard the corporate entity and hold the Individual Defendants liable for IRS's actions.[21]

■ "[P]ersuading a Delaware Court to disregard the corporate entity is a difficult task." *Harco Nat'l Ins. Co. v. Green Farms, Inc.,* No. 1131, 1989 WL 110537, at *4 (Del.Ch. Sept. 19, 1989); *accord Case Fin., Inc. v. Alden,* No. 1184–VCP, 2009 WL 2581873, at *4 (Del.Ch. Aug. 21, 2009) ("This Court will disregard the corporate form only in the 'exceptional case.'" (quoting *Sprint Nextel Corp., et al. v. iPCS, Inc., et al.,* No. 3746–VCP, 2008 WL 2737409, at *11 (Del.Ch. July 14, 2008))). To prevail on a veil-piercing claim, Plaintiff must prove fraud or injustice that goes beyond the alleged wrong in the Complaint and "relate[s] to a misuse of the corporate structure." *Medi–Tec of Egypt Corp. v. Bausch & Lomb Surgical, France,* No. 19760, 2004 WL 5366102, at *7 (Del.Ch. March 4, 2004). As the Court has previously noted, this is a high bar to overcome. (Doc. 60 at 20–21.)

■ Delaware courts consider several factors when assessing whether to allow piercing of the corporate veil, including: (1) the failure to keep standard corporate records; (2) the failure to observe corporate formalities; (3) undercapitalization at the corporation's formation; (4)

---

**20.** As the Court denies GEBAM's motion for summary judgment on the aiding and abetting claim for other reasons, it need not address the Individual Defendants' "approval and apportionment" defense.

**21.** To be sure, GEBAM's "piercing the veil claim" is not an independent legal claim, but rather a method by which GEBAM can hold the Individual Defendants liable for the actions of IRS. *Blair v. Infineon Tech. AG,* 720 F.Supp.2d 462, 470 n. 10 (D.Del.2010) ("Piercing the corporate veil is not itself an independent [ ] cause of action, but rather is a means of imposing liability on an underlying

cause of action." (quoting *Peacock v. Thomas,* 516 U.S. 349, 354, 116 S.Ct. 862, 133 L.Ed.2d 817 (1996))). Thus, even if GEBAM were able to justify piercing the corporate veil, it would have to prove IRS's underlying misconduct and resultant damages to recover on this theory. GEBAM's aiding and abetting claim, however, is a direct claim against the Individual Defendants and does not require that the Court disregard the corporate form, an action viewed as extreme and disfavored under Delaware law, as the Court discusses above.

insolvency; (5) exclusive domination and control over the company by the individual; and (6) "whether the dominant shareholder siphoned corporate funds." *Harco Nat'l Ins. Co.*, 1989 WL 110537, at *4–5; *Case Fin., Inc. v. Alden*, No. 1184–VCP, 2009 WL 2581873, at *4 (Del.Ch. Aug. 21, 2009); *Midland Interiors, Inc. v. Burleigh*, No. 18544, 2006 WL 3783476, at *4–5 (Del. Ch. Dec. 19, 2006); *Trs. of Nat. Elevator Indus. Pension, Health Benefit & Educational Funds v. Lutyk*, 332 F.3d 188 (3d Cir.2003) (citing William Meade Fletcher, Fletcher Cyclopedia of the Law of Corporations, ch. 2, § 41.33, Determinative factors—Inadequate capitalization ("The adequacy of capital is to be measured as of the time of formation of a corporation.")); *Hart Holding Co., Inc. v. Drexel Burnham Lambert Inc.*, No. 11514, 18 Del. J. Corp. L. 700, 719, 1992 WL 127567 (Del.Ch. May 28, 1992). "While no single factor justifies a decision to disregard the corporate entity some combination of the above is required, and an overall element of injustice or unfairness must always be present, as well." *Trevino v. Merscorp., Inc.*, 583 F.Supp.2d 521, 529 (D.Del.2008) (internal quotation marks omitted) (quoting *U.S. v. Golden Acres, Inc.*, 702 F.Supp. 1097, 1104 (D.Del.1988)).

Viewed in a light most favorable to GEBAM, the evidence before the Court is insufficient to sustain GEBAM's claim for piercing the corporate veil. Although some evidence suggests that the Individual Defendants engaged in unauthorized disbursements and over-allocated management fees and costs and that such conduct amounted to a siphoning of corporate funds, there is no evidence that the Individual Defendants did this through an abuse of the corporate form. There is no evidence, for example, that IRS failed to keep standard corporate records or observe corporate formalities. IRS was not undercapitalized when it was formed, and although there is evidence IRS was unable to pay its debts, this is insufficient to suggest that IRS's corporate form was a sham. Finally, while there is no doubt that the Individual Defendants exercised some degree of control over IRS, GEBAM has failed to show "exclusive domination and control by [the Individual Defendants] to the point that [IRS] no longer had legal or independent significance of [its] own." *Hart Holding Co., Inc.*, 18 Del. J. Corp. L. at 719 (quoted in *Wallace*, 752 A.2d at 1184).

In summary, IRS may have breached its fiduciary duties to GEBAM, and the Individual Defendants may have aided and abetted, but there is no evidence that IRS was a "sham and exist[ed] for no other purpose than as a vehicle for fraud." *In re Sunstates Corp. S'holder Litigation*, 788 A.2d at 534. Put simply, GEBAM has failed to establish fraud or injustice that goes beyond the alleged wrong in the Complaint and "relate[s] to a misuse of the corporate structure." As GEBAM cannot base liability on an abuse of the corporate form, the Court **DISMISSES** GEBAM's claim on a theory of piercing the corporate veil.

### C. Unjust Enrichment

To state a claim for unjust enrichment, a plaintiff must show: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and the impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." *Hampshire Grp., Ltd. v. Kuttner*, No. 3607–VCS, 2010 WL 2739995, at *36 (Del.Ch. July 12, 2010) (quoting *Schock v. Nash*, 732 A.2d 217, 232 (Del.1999)). GEBAM has moved for summary judgment asserting that the Individual Defendants have been enriched at its expense without justification and that

GEBAM has no adequate remedy at law. Defendant Brannen moved for summary judgment on this claim as well, arguing only that GEBAM's contract claim against IRS is an adequate remedy at law precluding a claim for unjust enrichment.

As an initial matter, this Court has previously rejected Brannen's argument, and will not reconsider it now. In its Order on Defendants' motion to dismiss, the Court explained that it would not dismiss the unjust enrichment claim " 'unless and until' a fact-specific determination can be made that the relationship [between the Individual Defendants and GEBAM] was exclusively governed by contract." (Doc. 60 at 18 (citing *Fitzgerald L.P. v. Cantor, et al.,* 1998 WL 326686, at \*6 (Del.Ch. June 16, 1998)).) There is no evidence to suggest that GEBAM's claims against the Individual Defendants are governed *exclusively* by contract. The Court therefore **DENIES** Brannen's motion for summary judgment on GEBAM's unjust enrichment claim.

GEBAM's motion for summary judgment fares no better because GEBAM has failed to produce sufficient evidence for the Court to assess the extent to which each Individual Defendant was actually enriched (if at all) by the alleged misconduct, and how such enrichment relates to GEBAM's impoverishment. In particular, while the parties agree that GEBAM "has been forced to satisfy over $2,000,000 in capital calls, each of which went unanswered by defendants," (Pl.'s Br. Supp. Mot. Summ. J. (Doc. 113–1) at 22; IDRSMF ¶ 19), GEBAM has failed to tie this impoverishment directly to the Individual Defendants' enrichment. GEBAM sweepingly cites to the McGladrey Spreadsheets to support its assertion that the Individual Defendants, or their affiliates, received an "excess of $2.7 million" of unauthorized disbursements. (Doc. 113–1 at 4–5; Pl.'s SMF ¶ 14.) However, based on GEBAM's citations to the record, the Court could only identify several thousand dollars of interest-free loans to some of the Individual Defendants. The Court cannot grant GEBAM summary judgment on its unjust enrichment claim without specific, undisputed facts, supporting a relationship between the purported unjustified enrichment of each Individual Defendant and GEBAM's associated loss of funds. It may well be that GEBAM will bring a litany of witnesses to trial to connect the dots of its unjust enrichment claim, but it has failed to do so here. Accordingly, the Court **DENIES** the parties' cross motions for summary judgment on the claim for unjust enrichment.

## V. CONCLUSION

It may be obvious to GEBAM why it is entitled to over $2 million in this action against the Individual Defendants. And perhaps GEBAM will put forth a compelling case at trial, complete with testifying witnesses and actual evidence of *unauthorized* transactions totaling in the millions. GEBAM has failed, however, to make such a case here on summary judgment. Likewise, although the Individual Defendants have put forth sufficient evidence to ward off an entry of judgment against them at this stage in litigation, they face serious hurdles in their defense at trial, not the least of which is the relatively thin support for their assertion that GEBAM authorized all questionable transactions. However, as a genuine issue of fact exists as to whether GEBAM authorized the transactions at issue in this case (and in fact, what transactions are actually at issue in the first place), the Court allows GEBAM's claim of aiding and abetting a breach of fiduciary duty and unjust enrichment to proceed to trial.

For this reason, and the reasons more thoroughly discussed above, the Court **DENIES** Plaintiff's Motion for Partial Summary Judgment and **GRANTS IN**

**PART** and **DENIES IN PART** Defendant David Brannen's Motion for Partial Summary Judgment. Plaintiff's claim premised on piercing the corporate veil is **DISMISSED** against Brannen. As GEBAM has had an adequate opportunity, and failed, to demonstrate why its veil-piercing claim should be maintained, the Court *sua sponte* dismisses Plaintiff's veil-piercing claim against Defendants G.J. Willem Noltes and Guy A. Savage as well.

Finally, the Court notes that it has previously directed the parties in this matter to mediation, to no avail. However, should the parties decide that mediation would be advantageous, the parties are **DIRECTED** to promptly notify the Court of their intention to pursue mediation by filing a joint Notice within 10 days of the entry date of this Order. In such case, the mediation shall conclude within 45 days of entry date of this Order. Unless the parties determine to proceed with mediation, their proposed consolidated pretrial order is due within 30 days of the entry date of this Order. L.R. 16.4(A), NDGa.